## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: **DCNC NORTH CAROLINA I, LLC** | : | **Chapter 11** |
| **GOOSE MARSH, LLC,** | : | |
| **Debtors** | : | **Bky. No. 09-11825ELF** |
| | : | |
| | : | **JOINTLY ADMINISTERED** |

# M E M O R A N D U M

## I. INTRODUCTION

DCNC North Carolina, L.L.C. ("DCNC") and Goose Marsh, L.L.C. ("Goose Marsh") (when referenced collectively, "the Debtors") each filed a voluntary petition under chapter 11 of the Bankruptcy Code in this court on March 16, 2009.[1]  DCNC and Goose Marsh are both "single asset real estate" debtors.  See 11 U.S.C. §101(51B).

Presently before the court is the Motion of Wachovia Bank ("Wachovia") for "Order Dismissing Bankruptcy Cases or, in the Alternative, Granting Relief from the Automatic Stay" ("the Motion").  Wachovia, the primary secured creditor of both Debtors, seeks dismissal of their cases under 11 U.S.C. §1112(b)[2] or, in the alternative, relief from the automatic stay under 11

---

[1]      The cases are docketed at Bky. No. 09-11825 and Bky. No. 09-11827 respectively.  The court entered an order providing for joint administration of the two (2) estates under Bky. No. 09-11825 on March 27, 2009.  See Docket Entry No. 23.

[2]      Section 1112(b)(1) provides in pertinent part:

> Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

U.S.C §§362(d)(1) and/or 362(d)(2).

Wachovia filed the Motion on March 31, 2009 and the Debtors filed their response on

April 16, 2009.  The court held an evidentiary hearing on the Motion on May 8, 2009.[3]  The

parties submitted post-hearing memoranda of law on May 15, 2009.  Based on certain events that

occurred in state court litigation described in more detail below,[4] on May 11, 2009, the Debtors

filed a motion requesting that this court stay its decision on the Motion.  The court held an

expedited hearing on the Debtors' stay request on June 3, 2009 and denied the request by order

dated June 11, 2009.  See Docket Entry No. 65.

The Motion is ready for decision.[5]

For the reasons set forth below, Wachovia's request for dismissal of both bankruptcy

---

[3]     The hearing, originally scheduled on April 29, 2009, was continued by agreement of the
parties to May 8, 2009.  See 11 U.S.C. §§362(e); 1112(b)(3).  In addition, prior to the May 8, 2009
hearing, Wachovia filed a "Supplemental Brief" in support of the Motion on May 4, 2009, to which the
Debtors responded on May 5, 2009.

[4]     See n.17, infra.

[5]     11 U.S.C. §1112(b)(3) provides that a motion to dismiss a chapter 11 case be decided
within fifteen (15) days after commencement of the hearing on the motion, unless the movant consents or
"compelling circumstances" prevent the court from meeting that time deadline.  In this case, Wachovia
did not expressly waive the time deadline.  The delay in this case was caused by the press of other
judicial business and my view that the consequences to the parties of my ruling and the nature of the
legal issues merited a comprehensive explanation of the reasons for the decision.  This made it
impossible to satisfy the fifteen (15) day deadline.  Some courts have found similar circumstances to
constitute "compelling circumstances."  See In re 210 West Liberty Holdings, LLC, 2009 WL 1522047,
at *1 (Bankr. N.D.W. Va. May 29, 2009); In re Jayo, 2006 WL 2433451, at *5 (Bankr. D. Idaho July 28,
2006).  See generally In re Pinnacle Laboratories, Inc., 2008 WL 5157981, at *4 (Bankr. D.N.M. June 19,
2008) (court observes that there is no apparent consequence for the failure to meet the deadline, but
"apologizes" for missing the deadline).

cases will be granted pursuant to 11 U.S.C. §1112(b)(1), (2) and (4)(A).[6]

## II.  SUMMARY OF DECISION

In this case, the Debtors are entities controlled by family members who appear to be sophisticated real estate developers.  Each Debtor entered into a cross-collateralized agreement with Wachovia to obtain financing for a separate real estate development project in North Carolina.  Both projects were multi-phase developments.  For at least one of the projects (DCNC's project), the economics were such that DCNC needed to complete later phases of the development to generate sufficient revenue to fully  repay the Wachovia loans for the earlier phases.  Rather than seek an agreement under which Wachovia would be obligated to provide the financing necessary for the entire project,[7] DCNC's financing agreement with Wachovia was limited to the initial phases.  The Debtors' principals expected the bank to provide the subsequent financing to DCNC based on their prior relationship with Wachovia and oral statements allegedly made to them on various occasions by a Wachovia representative.  The Debtors' principals further believe that, in the midst of this loan relationship, several of the alleged promises to provide the additional financing for the later phases were made when Wachovia had already decided not to do so.  The Debtors contend that their reliance on Wachovia's bad faith promises prejudiced their ability to obtain alternate financing, causing them

---

[6]    Therefore, it is unnecessary to decide if Wachovia is entitled to relief from the automatic stay under 11 U.S.C. §362(d).

[7]    I assume that some additional expense (i.e., loan fees) may have been involved had DCNC sought to enter into such an agreement

to default on the loans for both projects.  The default resulted in foreclosure proceedings against the Debtors' real estate.

These facts, if proven, cast the Debtors in a sympathetic light.  However, once their dispute with Wachovia ripened, the Debtors made the tactical choice of asserting "lender liability" type claims and seeking relief in the Court of Common Pleas, in Philadelphia, Pennsylvania ("the CP Court").  The Debtors sought bankruptcy relief only after they proceeded considerably far down the litigation path in their forum of choice  –  the CP Court  – and only after they were denied preliminary injunctive relief there and Wachovia pressed foreclosure proceedings on both properties in the North Carolina courts.  Significantly, even after commencing their bankruptcy cases, the Debtors continued the litigation of the claims then pending in the CP Court, only to suffer a major legal setback when, shortly after the bankruptcy filings, all of their claims were dismissed on the merits.  Once that occurred, the reorganization tools available to the Debtors became so restricted that it is now unlikely that a successful reorganization can occur.

In these circumstances, as described in more detail below, I conclude that Wachovia's request for dismissal of the Debtors' bankruptcy cases under 11 U.S.C. §1112(b) should be granted.

### III.  FACTUAL BACKGROUND

**A.  <u>The Debtors and the Real Estate Development Projects</u>**

Goose Marsh and DCNC are entities that serve as real estate development vehicles. Richard H. Dilsheimer controls the corporation that holds a 48% interest in each Debtor.  Other

members of the Dilsheimer family own the remaining interests in the Debtors.[8]  The Dilsheimers

state that they have operated successfully as real estate developers for many years.[9]

Goose Marsh is the owner of certain real estate located in Brunswick County, North

Carolina ("the Goose Marsh Property") that it intends to develop into a  residential community

known as "The Villages at Goose Marsh" ("the Goose Marsh Project").  Goose Marsh intends to

build and sell approximately two hundred (200) single family homes at the Goose Marsh Project.

Goose Marsh represents that it has sold and settled on seven (7) units.

DCNC is the owner of certain real estate in Surf City, North Carolina ("the Turtle Creek

Property") that it intends to develop into a residential community known as "The Villages at

Turtle Creek" ("the Turtle Creek Project").  DCNC's intention is to build and sell approximately

four hundred (400) units at the Turtle Creek Project.  DCNC represents that it has sold and

settled on twenty (24) units.


**B.  <u>Financing - Goose Marsh</u>**

On April 12, 2006, Goose Marsh entered into a construction loan agreement with

Wachovia ("the Goose Marsh CLA") in connection with the development of the Goose Marsh

Project.  On the same day, Goose Marsh executed an "A&D Note" in the amount of $10.0

---

[8]        The other ownership interests in both Goose Marsh and DCNC are as follows: Robert A.
Dilsheimer (34%), Thomas S. Dilsheimer (6%), Brian D. Dilsheimer (6%).  <u>See</u> Statement of Financial
Affairs of Goose Marsh ¶21.b (Docket Entry No. 34); Statement of Financial Affairs of DCNC ¶21.b
(Docket Entry No. 31).  Brian Dilsheimer's interest is disclosed as a "profits interest," while the other
owners' interests are described as an "ownership interest."  The distinction is not explained, but is not
material to the issue before the court.

[9]        Wachovia does not dispute this representation and I have no reason to doubt its veracity.

million, a Revolving Note in the amount of $3.0 million, secured by a Deed of Trust and Security Agreement in favor of Wachovia.  <u>See</u> Ex. M-1, M-4, M-5, M-7.

On April 13, 2007, Goose Marsh executed a First Amendment to the Goose Marsh CLA and an additional Loan Note in the amount of $3.5 million, secured by a Second Deed of Trust and Security Agreement in favor of Wachovia.  <u>See</u> Ex. M-2, M-6, M-8.[10]  I will refer to the loan documents collectively as "the Goose Marsh Loan Documents."

## C.  <u>Financing - DCNC</u>

On July 11, 2006, DCNC entered into a construction loan agreement with Wachovia ("the DCNC CLA") in connection with the development of the Turtle Creek Project.  On the same date, DCNC executed an "A&D Note" in the amount of $5.3 million, a Revolving Note in the amount of $2.0 million, secured by a Deed of Trust and Security Agreement in favor of Wachovia.  <u>See</u> Ex. M-11, M-13, M-14, M-16.

On June 1, 2007, DCNC executed a First Amendment to the DCNC CLA, an additional Loan Note in the amount of $2.7 million, secured by a Second Deed of Trust and Security Agreement in favor of Wachovia.  <u>See</u> Ex. M-12, M-15, M-17.  I will refer to the loan documents collectively as "the DCNC Loan Documents."

---

[10]        On March 10, 2008, Goose Marsh executed a Second Amendment to the Goose Marsh CLA and a Supplemental Deed of Trust and Security Agreement in favor of Wachovia to reduce the original A&D Loan availability from $10.0 million to $8.0 million and the Revolving Note availability from $3.0 million to $2.0 million.  <u>See</u> Ex. M-3, M-9.

**D.   Rejection of Request for Additional Financing for the Turtle Creek Project**

The DCNC credit facilities described above were intended to provide the financing of the first two (2) phases of the multi-phase development of the Turtle Creek Project.  During the summer of 2008, DCNC requested that Wachovia extend additional credit to finance the next phase of development of the Turtle Creek Project.  Wachovia rejected that request.

Wachovia's rejection of the request for additional financing is the crux of the parties' dispute.  The Debtors contend that, although each "phase" of the development may be financed separately, it is their custom when developing a property, to use a single bank to provide the financing for all of the project's phases.  With respect to the Goose Marsh and Turtle Creek Projects, the Debtors claim that it was understood by all the parties that Wachovia would finance the entire project.  As an illustration of this understanding, the Debtors contend that, before the loans were made, Wachovia was aware that the projections showed that the revenue expected to be generated by the first two (2) phases of the Turtle Creek Project would be inadequate to repay the outstanding indebtedness to Wachovia and that the obvious means for repaying the loan was to generate additional revenue through the next phases of the development.[11]

Further, the Debtors maintain that they reasonably relied, to their detriment, on repeated, express assurances made by a Wachovia representative during the course of their relationship that the bank would finance the remaining phases of the project.  Worse still, according to the Debtors, Wachovia continued to make these representations even after it had made the internal decision to downgrade the Debtors' credit rating and cease future lending.  The Debtors contend

---

[11]      At the hearing on the Motion, the Debtors presented the testimony of their Vice President and CFO, Maurice Johnson.  Mr. Johnson's testimony on this point was unrebutted.

that Wachovia's inequitable conduct prevented them from finding another institution to provide the financing for the balance of the project at a time when they had the ability to do so.[12]

### E.  Loan Defaults

The financing arrangements for the Goose Marsh Project and the Turtle Creek Project are "cross-defaulted."  In other words, a default under the DCNC Loan Documents triggers a default under the Goose Marsh Loan Documents and vice versa.  See Debtors' Resp. to Motion ¶31.

In two (2) letters dated October 16, 2004, sent to Goose Marsh and DCNC respectively, Wachovia declared a default under both the Goose Marsh Loan Documents and the DCNC Loan Documents.  See Ex. M-20, M-21.

The default letters state that the triggering default occurred in the Goose Marsh Project, thereby causing default in the Turtle Creek Project.  See Ex. M-20 (addressed to Goose Marsh) ("the Borrower violated Section 15.1 of the Loan Agreement by failing to . . . 'reduce the principal balance of the A&D Loan by $500,000 per calendar quarter' ending September 30, 2008;"); Ex. M-21 (addressed to DCNC) ("an Event of Default has occurred . . .  as a result of the Goose Marsh Event of Default . . .").[13]

---

[12]    Mr. Johnson's testimony in this court regarding the basis for the Debtors' expectation that Wachovia would finance the later phases of the Turtle Creek Project was unrebutted.

[13]    The Debtors attribute the default to Wachovia's alleged wrongful refusal to extend additional financing to DCNC in the summer of 2008, not to problems in the Goose Marsh Project.  See Debtors' Resp. to Motion ¶¶15-32.  Presumably, the Debtors believe that if the financing had been extended, DCNC's financial situation would have been sufficiently robust to permit DCNC to make the payments due Wachovia under the Goose Marsh Loan Documents and thereby avoid a default as to both projects.

**F.  Litigation in both Pennsylvania and North Carolina**

On August 11, 2008, the Debtors and other related entities filed an action ("the

Pennsylvania Action") against Wachovia in the CP Court.  In the Pennsylvania Action, the

Debtors sought, inter alia, to compel Wachovia to provide DCNC with additional funding in

connection with the Turtle Creek Project and to restrain Wachovia from exercising its default

remedies under the Goose Marsh Loan Documents and the DCNC Loan Documents.  The

Pennsylvania Action is based on theories of contract, fraud and negligent misrepresentation.[14]

On October 1, 2008, the Debtors requested the entry of a preliminary injunction in the

Pennsylvania Action.  On January 20, 2009, after a two-day evidentiary hearing (held on January

13 and 14, 2009), the CP Court denied the Debtors' request for a preliminary injunction.   The

Debtors appealed the January 20, 2009 order to the Pennsylvania Superior Court ("the Pa.

Superior Court") on February 19, 2009.

 Meanwhile, on or about February 3, 2009, Wachovia initiated nonjudicial foreclosure

proceedings in the General Court of Justice, Superior Court Division, in North Carolina against

both the Goose Marsh Property and the DCNC Property (collectively, "the North Carolina

Foreclosure Proceedings").[15]

The DCNC Property was scheduled for sheriff's sale on March 17, 2009 and the Goose

---

[14]    The state court complaint has not been made part of the record.  However, the CP Court
issued an opinion in the case, discussed in the text, infra, that identifies the claims raised in the litigation.
See  Ex. "A" attached to Wachovia's Supplemental Br. (Docket Entry No. 42)

[15]    Wachovia filed Notices of Hearing on Foreclosure of Deed of Trust and Security
Agreement with respect to the DCNC Property, captioned at Docket Number 09-SP-19 and with respect
to the Goose Marsh Property, captioned at Docket Number 09-SP-76.  See Motion ¶¶ 37, 39.

Marsh Property was scheduled for sheriff's sale on March 18, 2009.  The sales of both properties were stayed by Debtors' March 16, 2009 bankruptcy filings.

On April 21, 2009, the CP Court dismissed the Pennsylvania Action.[16]  In its accompanying opinion, the court held that: (1) North Carolina law governed the dispute; (2) the contract claims were barred by the Statute of Frauds; (3) the fraud claim failed because it was based on a promise of future intent (i.e., the alleged promise that Wachovia would commit to funding Phases 3, 4 and 5 of the Turtle Creek Project); and (4) the negligent misrepresentation claim failed because the relationship between the parties (i.e., experienced real estate developer/bank) was such that Wachovia had no duty to disclose its own financial problems or its perception of the Debtors as an increased credit risk.  See Ex. "A" attached to Wachovia's Supplemental Br. (Docket Entry No. 42).

The Debtors appealed the dismissal of the Pennsylvania Action to the Pa. Superior Court on May 15, 2009.  That appeal is currently pending.[17]

---

[16]    The Debtors were the plaintiffs in the Pennsylvania Action.  Therefore, the parties agree that it was not stayed under 11 U.S.C. §362(a) by the bankruptcy filings.  See Ass'n of St. Croix Condo. Owners v. St. Croix Hotel Corp., 682 F.2d 446, 449 (3d Cir. 1982).

[17]    After the dismissal of the Pennsylvania Action by the CP Court on April 23, 2009, the Debtors requested reconsideration of the dismissal order.  That request was denied on May 14, 2009.  The Debtors filed their appeal and also requested emergency relief from the Pa. Superior Court.  On May 22, 2009, shortly after the Debtors filed their request for emergency relief, that court granted a "stay" of "the matter" and directed Wachovia to file a response to the Debtors' motion.  See Ex. "A" attached to Debtors' Motion to Stay Motion (Docket Entry No. 53).  Based on the entry of the May 22, 2009 order, the Debtors requested this court stay its decision on the Motion and, as mentioned earlier in the text accompanying n.4, supra, the court denied that request.

It is not clear to me precisely what "emergency relief" the Debtors sought or what relief the Pa. Superior Court could provide to the Debtors (or any plaintiff-appellant for that matter) without deciding the merits of the appeal from the denial of the request for a preliminary injunction or the merits of the appeal from the dismissal of the entire case itself.  However, the issue is moot because the Pa.

**G.    The Debtors' Assets, Debts and Operations**

The value of the Goose Marsh Property is approximately $9,120,000.00.[18]  Aside from

the Goose Marsh Property, Goose Marsh has no assets other than a bank account of $1,262.00

and its interest in the pending Pennsylvania Action.  Goose Marsh's debt to Wachovia, which is

secured by the Goose Marsh Property, is approximately $12.0 million.  In its bankruptcy

Schedule F, Goose Marsh lists twenty (20) creditors, with scheduled claims totaling

$329,647.86.[19]

Goose Marsh has no employees.  Since filing its bankruptcy petition, Goose Marsh has

not operated its business and has generated no income.

The value of the DCNC Property is $4,680,000.[20]  Aside from the DCNC Property,

DCNC has no assets other than a bank account of $122,664.00 and its interest in the pending

Pennsylvania Action.  DCNC's debt to Wachovia, which is secured by the DCNC Property, is

approximately $5,900,000.00.  In its bankruptcy Schedules E and F, DCNC lists more than forty

(40) priority and general unsecured creditors with scheduled claims totaling approximately

---

Superior Court denied the Debtors' request for emergency relief on June 5, 2009.  The Debtors filed a
copy of that order with this court.  See Docket Entry No. 63.  This court then issued an order denying the
Debtors' request for a stay of its decision on the Motion on June 11, 2009.  See Docket Entry No. 65.
The Debtors then advised this court that they are requesting that the Pa. Superior Court  "advance" their
appeal.  See Docket Entry No. 64.

[18]    I credit the unrebutted appraisal testimony of Fitzhugh L. Stout ("Mr. Stout").  See also
Ex. M-23.

[19]    The largest debt listed is a disputed debt in the amount of $274,037.45.

[20]    I credit the unrebutted appraisal testimony of Mr. Stout.  See also Ex. M-22.

$750,000.00.[21]

DCNC has no employees.  Since filing its bankruptcy petition, DCNC has not operated its business and has generated no income.

The Debtors made some efforts to secure financing to resolve their difficulties both before and after their bankruptcy filing.  While Mr. Johnson, their CFO, testified that the Debtors' principals are prepared to contribute to this financing effort (through either a capital contribution or a loan to the Debtors), it appears that the bulk of the capital that the Debtors need and intend to raise would come in the form of loan from third party investors.  Mr. Johnson testified that the Debtors had spoken to fifteen (15) to twenty (20) potential investors since late 2008.  Some showed no interest, some specifically declined to invest; some (he believed) were still reviewing the investment opportunity.

More recently, in the weeks prior to the May 8, 2009 hearing, the Debtors communicated with two (2) investor groups.  Mr. Johnson did not identify any of the potential investors.   He also did not present any documentation regarding the status of these efforts to raise capital (e.g., in the form of a letter of intent, term sheet or otherwise).  Nor did he describe the terms of the potential refinancing requested by the Debtors.  Thus, it is not entirely clear whether the Debtors contemplate raising enough capital to satisfy Wachovia's secured claims in full (or whether it is feasible to do so) or whether their reorganization is limited to a payoff of a reduced Wachovia

---

[21]       I note, however, that ten (10) debts, aggregating more than $540,000.00 are listed as either contingent or disputed.

indebtedness.[22]


# IV.  DISCUSSION

## A.  Introduction

Wachovia seeks dismissal of the two (2) bankruptcy cases for cause under 11 U.S.C.

§1112(b).  Wachovia contends first that the Debtors subjectively filed the bankruptcy cases in

bad faith without a valid bankruptcy purpose and solely for the benefit of obtaining a tactical

advantage in the state court litigation between the parties in Pennsylvania and North Carolina.

See Motion ¶¶61, 63.  In addition, Wachovia suggests that neither case has a reasonable

possibility of resulting in a confirmed chapter 11 rehabilitation plan and therefore, the cases are

"objectively futile."  Id. ¶¶68, 72.

As explained below, I find that, at their inception, both cases were filed in good faith.

However, I also find, based on postpetition developments, that Wachovia has established that

the Debtors lack a reasonable prospect of achieving confirmation of a chapter 11 plan and the

evidence the Debtors have presented in response does not persuade me otherwise.[23]  Therefore,

---

[22]        I may take judicial notice of the dockets of bankruptcy cases filed in this district and the
content of the documents filed in such cases for the purpose of ascertaining the timing and status of
events in the case and facts not reasonably in dispute.  See Fed. R. Evid. 201; In re Scholl, 1998 WL
546607, at *1 n.1 (Bankr. E.D. Pa. Aug. 26, 1998).  I note that on June 15, 2009, after the hearing, the
Debtors filed their proposed chapter 11 plan ("the Debtors' Plan").  As I read the Debtors' Plan, it sheds
no further light on these questions.  See Debtors' Plan §§8.1-8.4 (Docket Entry No. 71).

[23]        Section 1112(b) strikes me as ambiguous as to which party has the burden of proof when
the "cause" alleged for conversion or dismissal is the asserted inability of the debtor to confirm a plan
and effectuate a rehabilitation.  On the one hand, §1112(b)(1) states unequivocally that the court shall
convert or dismiss a case "if the movant establishes cause."  This appears to place the burden of proof on
the movant for all §1112(b) motions, including ones in which the movant asserts that cause exists due to
the absence of a reasonable likelihood of rehabilitation.  See 11 U.S.C. §1112(b)(4)(A).  However,

Wachovia is entitled to the relief it seeks  – dismissal of both cases.


**B.  "Cause" for Dismissal Under §1112(b) - Bad Faith Filing**

Good faith is an implicit requirement in the filing of a chapter 11 bankruptcy case and a

case not filed in good faith is subject to dismissal under 11 U.S.C. §1112(b).  In re SGL Carbon

Corp., 200 F.3d 154, 160-62 (3d Cir. 1999).   The debtor bears the burden of proving good faith.

In re PPI Enterprises (U.S.), Inc., 324 F.3d 197, 211 (3d Cir. 2003) (citing SGL Carbon Corp.,

200 F.3d at 162 n.10).  The decision whether to dismiss a bankruptcy case for lack of good faith

is committed to the sound discretion of the bankruptcy court.  See In re Primestone Inv. Partners

L.P., 272 B.R. 554, 555 (D. Del. 2002); In re Forest Hill Funeral Home & Mem'l Park, 364 B.R.

808, 821 (Bankr. E.D. Okla. 2007); see also In re Tamecki, 229 F.3d 205, 207 (3d Cir. 2000)

(chapter 7 case).

The central function of the good faith filing requirement is to prevent abuse of the

bankruptcy system by limiting access only to those debtors who seek bankruptcy protection for

─────────────────────

§1112(b)(2) states that, if cause is established, the court has the authority not to convert or dismiss a case
only if: (1) there are "unusual circumstances;" (2) conversion or dismissal is not in the best interest of
creditors and the estate; and (3) the debtor or another party in interest establishes that there is a
reasonable likelihood that a plan will be timely confirmed.  It is the third requirement that creates an
ambiguity in that it appears to suggest that the burden of proof is on the debtor (or other plan proponent).

        I note also that there is a textual anomaly in §1112(b)(2) with respect to the standards
stated to be employed by the court in exercising its discretion regarding conversion or dismissal of a
case.   The structure of the provision and substantive changes made in §1112(b) suggest that Congress
intended that once cause is established, a case will not be converted only if there are unusual
circumstances.  However, literally, the provision states that the court may decide not to convert or
dismiss the case absent unusual circumstances.  The use of the word "absent" in this context appears to
contradict the rest of the provision.

        In any event, assuming, arguendo, that Wachovia bore the burden of persuasion on cause
under §1112(b)(4)(A), I find that the burden has been met.

its intended purposes.  See In re Integrated Telecom Express, Inc., 384 F.3d 108, 119 (3d Cir.

2004).  In the business bankruptcy context, generally, those valid bankruptcy purposes will be the

preservation and rehabilitation of a going concern or the maximizing of the value of a debtor's

estate for the benefit of creditors through an orderly liquidation.  See id.; accord PPI Enterprises,

324 F.3d at 211-21 (bankruptcy case filed by debtor primarily to invoke the landlord claim "cap"

of §502(b)(6) as part of a liquidating chapter 11 plan filed in good faith); In re Clinton

Centrifuge, Inc., 72 B.R. 900, 905 (Bankr. E.D. Pa. 1987) (citations omitted) ("When a debtor is

motivated by plausible, legitimate reorganization (or liquidation) purposes and not solely or

predominantly by the mere desire to prevent foreclosure or hinder creditors, bad faith is not

present in a chapter 11 case.").  By comparison, a case filed by a debtor merely to obtain a

tactical litigation advantage when the debtor is not otherwise suffering financial distress is not in

good faith.  See SGL Carbon Corp., 200 F.3d at 167.  Nor, of course, is a case initiated solely to

hinder or delay creditors filed in good faith.  See  In re Dale Mabry Properties, Ltd., 149 B.R. 209

(M.D. Fla. 1992); Matter of Mitan, 168 B.R. 326 (Bankr. E.D. Mich. 1994).

A debtor's subjective good faith, as defined above, is necessary, but not sufficient to

avoid dismissal for lack of good faith.  The court must also consider whether the attempt to

achieve the debtor's proper goals is objectively futile.  If so, the case is not filed in good faith.

See In re SB Properties, Inc., 185 B.R. 198, 204 (E.D. Pa. 1995) ("the issue of good faith

involves both subjective and objective dimensions");[24] see also SGL Carbon Corp., 200 F.3d at

---

[24]      In In re Roxy Real Estate Co., Inc., 170 B.R. 571 (Bankr. E.D. Pa. 1993), the court
explained the interrelationship between the subjective and objective aspects of good faith as follows:

Obviously . . . there is an overlap to the objective and subjective components.
The more objectively clear it is that a debtor cannot reorganize, it is

165 ('The term "good faith' is somewhat misleading.  Though it suggests that the debtor's

subjective intent is determinative, this is not the case.  Instead, the 'good faith' filing requirement

encompasses several, distinct equitable limitations that courts have placed on Chapter 11

filings.").

   The court's determination of the good faith issue is a fact intensive inquiry based on the

totality of the circumstances. Integrated Telecom Express,, 384 F.3d at 118.  To facilitate the

good faith inquiry, courts have compiled and employed lists of good faith "factors," employing

them to the extent they are relevant.  When present, the factors suggest that the case was not filed

in good faith.

   One such list of factors was set forth in SB Properties:

      (1) the debtor has few or no unsecured creditors;

      (2) there has been a previous bankruptcy petition by the debtor or a related entity;

      (3) the prepetition conduct of the debtor has been improper;

      (4) the petition effectively allows the debtor to evade court orders;

      (5) there are few debts to non-moving creditors;

      (6) the petition was filed on the eve of foreclosure;

      (7) the foreclosed property is the sole or major asset of the debtor;

      (8) the debtor has no ongoing business or employees;

      (9) there is no possibility of reorganization;

---

concomitantly more difficult to conclude that the debtor's subjective belief in its
ability to reorganize is in good faith.

Id.  at 573 (quoted in  SB Properties, 185 B.R. at 205 n.4).

(10) the debtor's income is not sufficient to operate;

(11) there was no pressure from non-moving creditors;

(12) reorganization essentially involves the resolution of a two-party dispute;

(13) a corporate debtor was formed and received title to its major assets immediately before the petition; and

(14) the debtor filed solely to create the automatic stay.

185 B.R. at 205.

After compiling this list, the court in <u>SB Properties</u> wisely cautioned that

> courts should guard against any impulse to overemphasize any one factor, to engage in mere "indicia-counting," or to "force particular facts into previously identified patterns." . . . [T]he totality of factors must be viewed, that no one factor can ever be deemed dispositive, and that any conceivable list of factors cannot be exhaustive.

<u>Id.</u> at 205 n.5 (quoting <u>Carolin Corp. v. Miller</u>, 886 F.2d 693, 701 (4th Cir. 1993)); <u>see also</u> <u>SGL Carbon</u>, 200 F.3d at 166 n.16 ("no list is exhaustive of all the factors which could be relevant when analyzing a particular debtor's good faith") (quoting <u>In re Laguna</u>, 30 F.3d 734, 738 (6th Cir. 1994)).

Here, I am satisfied that the Debtors have met their burden of establishing, by a preponderance of the evidence, that their bankruptcy petitions initially were filed in good faith.

Certainly, Wachovia has some basis for its claim that the cases were not filed in good faith.[25]  Wachovia asserts that six (6) of the "bad faith" factors referenced above are present.  <u>See</u> Motion ¶62.  I agree with Wachovia that four (4) factors are present that, in some circumstances, tend to suggest a lack of good faith: (1) the petition was filed on the eve of foreclosure; (2) the

---

[25]      Specifically, Wachovia asserts that the facts in this case are consistent with the first, sixth, seventh, tenth, twelfth and fourteenth factors.

bankruptcy is driven, to a significant extent, by a dispute with one (1) creditor that is capable of

resolution in state court; (3) the asset subject to foreclosure in the parties' dispute is the sole asset

of each Debtor; and (4) presently, the Debtors' income is insufficient to operate.   However, I

find the more telling factors in this case are the last two (2) factors Wachovia identifies: (1) the

Debtors have few unsecured creditors with relatively small claims and (2) the Debtors filed this

case solely to invoke the automatic stay.  Id.  The Debtors vigorously dispute Wachovia's

characterization of the facts with respect to the last two (2) factors mentioned.  To a large extent,

the dispute regarding these last two (2) factors goes to the heart of the good faith filing issue.

    The record demonstrates that some time in 2008, less than one (1) year before the

commencement of the bankruptcy cases, both Debtors were actively engaged in the development

of the two (2) real estate projects  –  the Debtors were building and selling houses and servicing

their debt to Wachovia.  The Debtors filed the bankruptcy cases believing that, with the necessary

financing, both projects were viable and capable of generating sufficient revenue to repay all

creditors in full, including Wachovia.[26]  The amount of unsecured debt of each Debtor

($329,647.86 for Goose Marsh and $750,000.00 for DCNC), while substantially less than

Wachovia's secured claims, cannot be characterized as de minimus.  Further, at the time the

cases were filed, the Debtors had already instituted litigation (the Pennsylvania Action) to

compel Wachovia to provide financing for the two (2) real estate projects.  Alternatively, the

claims raised in the Pennsylvania Action, if successful, could have substantially reduced

---

[26]    I do not find the fact that these particular debtor-entities lack a long history of operations
to be especially significant.  It is well known that it is customary for real estate developers to form a
single purpose entity for each separate real estate project.  The principals of the debtor-entities have a
successful track record in the field.

Wachovia's claims against the Debtors, thereby facilitating the reorganization. These
circumstances suggest that the filing of the bankruptcy cases was motivated by a plausible
reorganization purpose, rather than "demonstrable frivolous purposes absent any economic
reality." Clinton Centrifuge, 72 B.R. at 908 (quoting Matter of Northwest Recreational
Activities, Inc., 4 B.R. 36, 39 (Bankr. D. Ga. 1980) (per Norton, J.)).[27]

Yet, closer examination of the status of the Pennsylvania Action at the time the
bankruptcy cases were filed suggests that the good faith issue may be a closer question.
Significantly, prior to the bankruptcy filings, the CP Court denied the Debtors' request for a
preliminary injunction staying Wachovia from foreclosing against the Goose Marsh Property and
the Turtle Creek Property. Thus, the subsequent bankruptcy filings include a whiff that they
were filed to obtain the stay of proceedings that the Debtors were unable to obtain from the CP
Court, particularly since the Debtors' reorganization strategy has appeared heavily dependent
(although, as discussed below, not exclusively dependent) on obtaining some relief in the
Pennsylvania Action. In other words, viewed in the most negative light, the purpose of the
bankruptcy filings arguably may have been to stay Wachovia while the Debtors litigated their

---

[27]    As the court observed in a related context in In re Koopmans, 22 B.R. 395, 404 (Bankr.
D. Utah 1982):

> The debtor needs an overhaul using the tools of reorganization. He files because
> executory contracts may be rejected. Liens may be avoided. Property may be
> sold. Liabilities may be reduced or the terms of payment altered. If
> mismanagement is the cause of failure, a trustee may be appointed. Meanwhile,
> debtor, the trustee, creditor committees, and other parties in interest are
> bargaining toward a plan. . . . No one knows whether the debtor can survive
> until he has done what Chapter 11 affords him occasion to do: clean house and
> work out a plan.

claims against Wachovia -- even though that same state court, in which those claims were

pending, already had declined the Debtors' request for a stay (by denying the requested

preliminary injunction).

There is a response to this concern. The denial of the preliminary injunction was not a

final order on the merits of the Debtors' claims. Thus, at the time the bankruptcy cases were

filed, the Debtors' claims against Wachovia were still pending and viable in the CP Court, with

the potential for providing the Debtors with substantial relief.

In this case, after an "on-the-spot evaluation of the [Debtors'] financial condition,

motives, and the local financial realities,"[28] based on the legal principles and factual

circumstances described above, I find that the Debtors filed these cases in good faith. The

combination of the potential value of the assets (if developed), the existence of creditors other

than Wachovia and the potential merit of the Debtors' extant claims against Wachovia, <u>at the

time the bankruptcy cases were filed</u>, suffice to convince me that the Debtors were motivated by

a plausible, proper reorganization purpose that, at that time, was not objectively futile.[29]

---

[28]    <u>Integrated Telecom Express</u>, 384 F.3d at 121 (quoting <u>In re Little Creek Dev. Co.</u>, 779
F.2d 1068, 1072 (5th Cir. 1986)).

[29]    In addition, I note that courts finding that a bankruptcy case was filed in bad faith to
achieve a tactical advantage in litigation frequently base that conclusion on a concomitant factual finding
that the debtor was financially healthy and had no need to reorganize. <u>See, e.g.</u>, <u>SGL Carbon</u>, 200 F.3d
at 166-68; <u>In re Schur Mgmt. Co., Ltd.</u>, 323 B.R. 123, 126-27 (Bankr. S.D.N.Y. 2005); <u>In re Muskogee
Envtl. Conservation Co.</u>, 236 B.R. 57, 68 (Bankr. N.D. Okla. 1999). That is not the case here.

**C.   "Cause" for Dismissal Under §1112(b) - Inability to Reorganize**

Wachovia next argues that, even if the bankruptcy cases were initially filed in good faith,

they should be dismissed because the Debtors cannot now propose a feasible plan of

reorganization.  In support of its position, Wachovia cites, inter alia, In re 3 RAM, Inc., 343 B.R.

113 (Bankr. E.D. Pa. 2006).


**1.   statutory basis for the dismissal request**

In 3 RAM, Judge Sigmund pointed out that 11 U.S.C. §1112(b)(2) previously identified

an "inability to effectuate a plan" as a non-exclusive example of "cause" for conversion or

dismissal, but that Congress deleted that particular subsection (i.e., former §1112(b)(2)) from the

statute in 2005.  See 343 B.R. at 118 n.14 (citing Bankruptcy Abuse Prevention and Consumer

Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005) ("BAPCPA")).  Current

§1112(b)(4)(A) is the closest analogue to former §1112(b)(2).  It provides that cause includes

"substantial or continuing loss to or diminution of the estate and the absence of a reasonable

likelihood of rehabilitation."

Consideration of the deletion of former §1112(b)(2) and the current text of the statute

leads to the question whether a request for dismissal under §1112(b)(4)(A) requires a showing of

both a diminution of the estate and an inability to reorganize.  On this point, in 3 RAM, Judge

Sigmund reasoned:

> [W]here the debtor is not an operating company as here but merely holds an
> .  .  .  asset, the loss or diminution prong of §1112(b)(4)(A) is not relevant and the
> old §1112(b)(2) remains the applicable grounds for cause.  I can discover no
> explanation for the elimination of §1112(b)(2) or (b)(3) ("delay that is prejudicial
> to creditors").  However, as the bankruptcy bill provision amending §1112 is titled

"Expanded Grounds for Dismissal or Conversion and Appointment of Trustee,"
HR Rep. No. 31, 109th Cong., 1st Sess.442 (2005) (emphasis added), and as the
amended provision limits the court's discretion to refuse to dismiss or convert
upon a finding of cause seemingly to lower the barrier to dismissal, it is unlikely
that cause found under the prior case law based on grounds either not enumerated
(e.g., bad faith) or no longer enumerated (e.g., inability to effectuate a plan) will
not be cause under BAPCPA.

343 B.R. at 118 n. 14.

Fundamental bankruptcy policy continues to support the proposition that the inability

to propose a feasible reorganization or liquidation plan provides "cause" for dismissal or

conversion of a chapter 11 case on request of an interested party. Therefore, I agree with Judge

Sigmund's conclusion that the inability to effectuate a plan, by itself, provides cause for

dismissal or conversion of a chapter 11 case.[30]

## 2.  the parties' contentions

Wachovia's primary contention – that the Debtors cannot propose a confirmable plan of

reorganization[31] – is grounded in two (2) subsections of 11 U.S.C. §1129, the Code provision

setting forth the requirements for confirmation. Specifically, Wachovia relies on 11 U.S.C.

§1129(a)(10) and §1129(b)(2)(B)(ii).

---

[30]    I further point out (as did Judge Sigmund) that the prefatory language of §1112(b)(4)
continues to state that cause "includes" the enumerated examples that follow in subsections (A) - (P) and
the 2005 amendments did not alter the rule of construction that "includes" is not a term of limitation. See
11 U.S.C. § 102(3).

[31]    In its submissions, Wachovia referred to the Debtors' "plan" in the singular, apparently
assuming that in these jointly administered cases, the Debtors would file a joint plan of reorganization.
Wachovia assumed correctly. See Debtors' Plan (Docket Entry No. 71).

Wachovia reasons as follows:

1. It expects its secured claims totaling approximately $18 million to be allowed in full, notwithstanding the Debtors' state court attack.

2. Its secured claims are undersecured and therefore, may be bifurcated into allowed secured and allowed unsecured claims. See 11 U.S.C. §506(a);

3. The claims are so substantially undersecured that, after bifurcation, Wachovia can control the acceptance or rejection of the Debtors' plan by the class of unsecured creditors;

4. Wachovia will reject the Debtors' chapter 11 plan both as a secured creditor and an unsecured creditor;

5. Wachovia's rejection of the Debtors' plan will render it unconfirmable because the Debtors will not be able to obtain the acceptance of at least one (1) impaired class of creditors. See 11 U.S.C. §1129(a)(10) (if a class is impaired, confirmation requires acceptance of plan by at least one (1) impaired class); id. §1129(b)(2)(B)(ii) (to confirm plan that is not accepted by all impaired classes, the plan must, inter alia, be accepted by at least one impaired class);

6. Any attempt by the Debtors to classify some unsecured creditors separately to create an accepting, impaired class of creditors would run afoul of binding Third Circuit precedent. See In re Swedeland, Dev. Group, Inc., 16 F.3d 552, 568 (3d Cir. 1994) (discussing limitation on debtor's right to classify undersecured mortgagee separately in order to create an impaired class that may accept the plan) (citing John Hancock Mutual Life Ins. Co. v. Route 37 Bus. Park Assocs., 987 F.2d 154, 161 (3d Cir.1993)).

7. Because the Debtors' reorganization theory requires success in the Pennsylvania Action (now pending in the Pa. Superior Court), the reorganization is not feasible because it is dependent on the speculative outcome of litigation. See, e.g., In re Edwards, 1996 WL 407253. at *4-6 (Bankr. E.D. Pa. June 17, 1996).

Wachovia's analysis appears valid and has prima facie appeal. In the Goose Marsh case, Wachovia appears to be undersecured by almost $3 million, an amount far in excess of the $329,647.86 in scheduled unsecured claims. In the DCNC case, Wachovia's unsecured claims appears to be approximately $1 million, also significantly in excess of the $750,000 in scheduled

unsecured claims.  If Wachovia holds unsecured claims in these amounts, it controls the vote of

the class of general unsecured creditors.  See 11 U.S.C. §1126(c).[32]  In these circumstances, the

Debtors may have great difficulty structuring a confirmable chapter 11 plan over Wachovia's

opposition, consistent with Swedeland and John Hancock.[33]  The dismissal of the Debtors'

claims in the Pennsylvania Action lends further credence to Wachovia's analysis.

The Debtors' response boils down to two (2) arguments.

First, they assert that Wachovia's "futility" argument is based on the faulty premise that

Wachovia's proofs of claim will be allowed in full.  The Debtors suggest that they made an

adequate showing that Wachovia's alleged inequitable prepetition conduct will likely result in

the elimination (or at least the substantial reduction) of its allowed secured claims either through:

---

[32]     Section 1126(c) provides:

> A class of claims has accepted a plan if such plan has been accepted by creditors,
> other than any entity designated under subsection (e) of this section, that hold at
> least two-thirds in amount and more than one-half in number of the allowed
> claims of such class held by creditors, other than any entity designated under
> subsection (e) of this section, that have accepted or rejected such plan.

[33]     The Debtors argue that by establishing an impaired class of "convenience claims" (i.e.,
small unsecured claims, separately classified for administrative convenience), see 11 U.S.C. §1122(b),
they can propose a plan that has a reasonable prospect of being accepted by an impaired class.  In fact,
the Debtors' Plan does create a convenience class of unsecured claims of less than $2,500.00, designated
as Class 4, and larger claims whose holders elect to be treated as Class 4 Claims.  The Debtors' Plan
states there are nineteen (19) DCNC creditors falling within the class, with claims totaling $7,255.38, and
twelve (12) Goose Marsh creditors falling within the class, with claims totaling $10,875.35.

Whether such a separate classification of convenience claims is permissible depends on
whether it is both "reasonable and necessary."  Id; see generally In re National/Northway Ltd.
Partnership, 279 B.R. 17, 24-25 (Bankr. D. Mass 2002) (finding no justification for creation of a
convenience class in a case with few creditors and concluding that the creditor's argument that debtor
was attempting to "gerrymander" the classes).  In this case, I make no finding on the issue.  See also n.41,
infra.

1. the Debtors' eventual success in the Pennsylvania Action; or

2. a successful objection to Wachovia's claims filed in this court based on the
   doctrine of "defensive promissory estoppel."

Thus, according to the Debtors, at the conclusion of the Pennsylvania Action and/or the

bankruptcy claims allowance process, Wachovia's claims will be substantially less than the value

of the properties securing the claims.

Second, the Debtors argue that they can obtain the necessary financing to reorganize.

After their projected successful objection to Wachovia's claims, they assert that they can propose

a confirmable plan by refinancing their then much-reduced Wachovia indebtedness.

Alternatively, they contend that even if their efforts to reduce Wachovia's secured claims fail,

they can procure the necessary financing to pay off Wachovia.

The Debtors suggest that the evidence presented at the May 8, 2009 hearing was

sufficient to establish that they are reasonably likely to carry out both parts of this reorganization

strategy.[34]

As explained below, I find the Debtors' position on each point flawed, leaving me

unconvinced that the Debtors can confirm a plan within a reasonable time.

---

[34]      This theory also serves as the bedrock of the Debtors' defense against Wachovia's
motion for relief under 11 U.S.C. §362(d).  If Wachovia's secured claims are allowed in an amount
substantially less than the value of its collateral, the equity cushion will provide Wachovia with adequate
protection, see id. §362(d)(1) and the existence of that equity precludes relief under §362(d)(2).  I do not
reach this issue.  See n.6, supra.

### 3.  the Pennsylvania Action

The first problem is the central role that the expected success of the Pennsylvania Action plays in the Debtors' reorganization strategy.

Wachovia asserts that the reorganization is not feasible because it is dependent on the speculative outcome of litigation, i.e., the Pennsylvania Action.  See, e.g., Edwards, 1996 WL 407253, at *4-6.  The Debtors contend that chapter 11 plans are not infeasible per se simply because their success is contingent on the outcome of litigation.  See In re Applied Safety, Inc., 200 B.R. 576, 585-86 (Bankr. E.D. Pa. 1996).

For purposes of argument, I will accept the Debtors' suggested general proposition that, in appropriate circumstances, the proceeds or other relief requested in pending litigation can provide the means to effectuate a chapter 11 plan.  Here, however, I find that the Debtors cannot demonstrate a sufficient likelihood of success in the Pennsylvania Action to warrant the confirmation of a chapter 11 plan that is dependent on the litigation.

The difficulty with the Debtors' argument is that the Pennsylvania Action was dismissed on the merits on April 23, 2009 (approximately five (5) weeks after the bankruptcy cases were filed).[35]  As a result of this dramatic change in the legal landscape, any doubts about the difficulties the Debtors face in succeeding in that litigation following the denial of their request for a preliminary injunction in January 2009 have been laid to rest.  At this point, the Debtors' prospects of timely success in the Pennsylvania Action are uncertain at best.  Not only must they succeed on appeal, but the action will have to be remanded to the CP Court where the remaining

---

[35]        After the commencement of the bankruptcy cases, the Debtors represented to this court that they were considering removing the Pennsylvania Action to this court, see 28 U.S.C. §1452, but they did not do so and the litigation ran its course in the CP Court.

pleadings will have to be filed, discovery completed, trial held and a final decision rendered.
Perhaps Wachovia overstates its case by suggesting that the Debtors cannot realistically expect to
see any recovery for four (4) to five (5) years.  See Wachovia Post-Hearing Br. at 5 (Docket
Entry No. 49).  Undoubtedly, however, the time period must be measured in years and,
considering the potential for further appeals, Wachovia's estimate may turn out to be accurate.

In the present circumstances, the Debtors cannot rely on their hoped-for success in the
Pennsylvania Action as the foundation of their reorganization strategy.[36]  Any plan based on such
a strategy is not feasible.  See 11 U.S.C. §1129(a)(11).

### 4.  defensive promissory estoppel

Next, I consider the Debtors' proposed defensive use of promissory estoppel as a basis for
their putative objection to Wachovia's proofs of claim.[37]

I will accept arguendo, the prerequisite to the Debtors' use of promissory estoppel in this
court: that neither the Pennsylvania Action nor the North Carolina Foreclosure Proceedings bar
the invocation of the doctrine.[38]  Nevertheless, after reviewing the relevant legal authority under

---

[36]      The Pennsylvania Action remains a focal point of the Debtors' proposed reorganization.
See Debtors' Plan ¶8.2.

[37]      The Debtors do not argue that they may object to Wachovia's proofs of claim based on
the affirmative fraud or negligent misrepresentation claims raised originally in the CP Court.
Presumably, the Debtors believe that they are prevented from doing so by the doctrine of collateral
estoppel.  See 28 U.S.C. §1738; National R.R. Passenger Corp. v. Pennsylvania Public Util. Comm'n,
342 F.3d 242, 254 (3d Cir. 2003).

[38]      I need not decide the issue. I note only that there appears to be a reasonable basis for the
Debtors' position on this point.

North Carolina law,[39] I conclude that the Debtors' promissory estoppel defense is unavailing.

The two (2) distinct uses of promissory estoppel were concisely summarized in <u>Dealers</u>

<u>Supply Co., Inc. v. Cheil Indus., Inc.</u>, 348 F. Supp.2d 579  (M.D.N.C. 2004) as follows:

> The first [use of promissory estoppel], an extension of traditional equitable estoppel, applies where there is a "promise or representation as to an intended abandonment by the promisor of a legal right which he holds or will hold against the promisee."  This use is considered defensive . . . .

> By contrast, a number of jurisdictions recognize a broader affirmative or offensive

---

The CP Court's opinion does not mention promissory estoppel and its primary subject was whether the Debtors have an affirmative contract or tort claim entitling them to restrain Wachovia from foreclosing and compelling Wachovia to extend additional credit.  The issue was not whether the amount of the existing indebtedness should be reduced based on a promissory estoppel defense.  <u>See</u> <u>generally</u> Cohen v. Worker' Comp. Appeal Bd. (City of Philadelphia), 909 A.2d 1261, 1264 (Pa. 2006) (collateral estoppel requires, <u>inter alia</u>, that the precluded issue is identical to one that was presented in a prior case).

As for the North Carolina Foreclosure Proceedings, those actions were nonjudicial proceedings involving a power of sale under a deed of trust; therefore, there was no judicial determination of the amount of Wachovia's claims against them. It appears that the North Carolina court, acting through the clerk, determined only that there was a "valid debt" (not liquidated), a default and a right to foreclose under the governing instrument.  <u>See</u> N.C. Gen. Stat. § 45-21.16(d) (West 2009). Further, Wachovia acknowledges that the clerk lacks the authority to consider equitable defenses to foreclosure.  <u>See</u> Wachovia's Post-Hearing Br. at 8 n.4.  Nor does Wachovia claim that the amount of its claim against the Debtors was determined in the North Carolina Foreclosure Proceedings.  <u>See</u> <u>Bluebird</u> <u>Corp. v. Aubin</u>, 657 S.E.2d 55, 61 (N.C. App. 2008) (collateral estoppel requires existence of final judgment on the merits in prior suit of identical issue that was actually litigated), <u>rev. denied</u>, 669 S.E.2d 741 (N.C. 2008).

[39]    I am well aware that in seeking reconsideration of the dismissal order in the Pennsylvania Action in the CP Court and in its appellate filings in the Pa. Superior Court, the Debtors have asserted that Pennsylvania law applies and that the CP Court erred in applying North Carolina law. <u>See</u> Ex. "B" at 18, attached to Debtors' Motion to Stay Motion (Docket Entry No. 53).  In this court, however, the Debtors have relied solely on North Carolina law in support of their position.  <u>See</u> Debtors' Resp. to Wachovia's Supplemental Br. at ¶¶13-14 (Docket Entry No. 43); Debtors' Post Hearing Br. at 9 (Docket Entry No. 48).  Perhaps the Debtors did so believing that collateral estoppel applies to the CP Court's choice of law determination (<u>i.e.</u>, that North Carolina law applies).  In any event, in this court, the Debtors invoked North Carolina law and Wachovia responded by citing only to North Carolina law. For purposes of analyzing the merits of the Debtors' position and its effect on the likelihood of a successful reorganization, I will hold the Debtors to the choice of law position they have taken here.

use that originates from the Second Restatement of Contracts . . . .  This broader view of promissory estoppel can be used to supply a missing element to a contract, giving the promisee an enforceable right of action in contract against the promisor. Affirmative use occurs when a promisee attempts to create a contract which would not exist without the application of promissory estoppel.

Id. at 586-87 (citations omitted); see also Home Electric Co. of Lenoir, Inc. v. Hall and Underdown Heating & Air Cond. Co., 358 S.E.2d 539 (N.C. App. 1987), aff'd, 366 S.E.2d 441 (N.C. 1988).

The Debtors invoke only the defensive use of the promissory estoppel doctrine, which was described by the Dealers Supply court as applicable in "limited situations."  348 F. Supp. 2d at 586.  In JD Benefits, Inc. v. Harrington Wealth Mgmt., Inc., 2005 WL 1660561, at *7 (M.D.N.C. July 13, 2005), the court opined that "[t]he North Carolina courts have applied the doctrine of promissory estoppel when it has been raised defensively as a shield against a claim by one who, in bringing suit, is essentially reneging on a promise not to do so."

Even more to the point for purposes of the instant case is the North Carolina Supreme Court's discussion in Clement v. Clement, 55 S.E.2d 459 (N.C. 1949).  In Clement, the court distinguished between the use of promissory estoppel to bar the "right to recover a stated sum of money on a promissory note" and its use to find a "waiver of a mere right relating to procedure or remedy."  Id. at 461.  The court held unequivocally that a post-contractual promise cannot be invoked to reduce the indebtedness on a note absent further consideration and that promissory estoppel cannot substitute for actual consideration.  See id.  The Debtors have not cited, and my research has not located, any subsequent decision that undermines the vitality of the legal principle expressed in Clement.  Cf. Wachovia Bank & Trust Co. v. Rubish, 293 S.E.2d 749 (N.C. 1982) (successful use of promissory estoppel to defend against ejectment based on end of term of

-29-

lease where evidence supported a finding that landlord waived a <u>procedural right</u> (<u>i.e.</u>, written

notice as opposed to oral notice of tenant's exercise of option to extend lease)).

Nothing in the record remotely suggests that Wachovia ever led the Debtors to believe that

it would forego full payment of the outstanding indebtedness.  Even if there were such evidence,

any reduction of the indebtedness would have to be supported by consideration.  In its best light,

the Debtors' contention that Wachovia inequitably breached its promises to provide additional

financing should result only in a waiver of Wachovia's right to strict and timely performance of

the Debtors' repayment obligation; not a waiver of its entitlement to full repayment of the

indebtedness.  Thus, if the promissory estoppel defense is meritorious, the appropriate remedy

would be to restrain Wachovia from exercising its legal remedies for some reasonable period of

time.  That may be a temporary defense to foreclosure, but it does not provide a basis to reduce

Wachovia's allowed secured claims in this court.

In short, in the present circumstances, promissory estoppel is not a defense that would

cause a bankruptcy court to reduce the amount of Wachovia's allowed secured claims.  Therefore,

I fail to see how the doctrine of defensive promissory estoppel can be employed to obtain a

substantial reduction of Wachovia's allowed secured claims thereby facilitating the Debtors'

reorganization.


### 5.   refinancing

Having concluded that the Debtors have presented no scenario that is reasonably likely to

result in a reduction of Wachovia's allowed secured claims, I accept Wachovia's analysis that any

reorganization plan that proposes to impair Wachovia's claims also has no reasonable prospect of

being confirmed.  This leaves the last arrow in the Debtors' quiver: their representation that they

can obtain refinancing to "take out" Wachovia, even if its allowed secured claims are not reduced

via the claims raised in the Pennsylvania Action or through defensive promissory estoppel.

      Based on the meager record created on the issue, I have little difficulty finding that the

Debtors' vague presentation regarding its financing effort, described above in Part III.G., is

inadequate to show that there is a reasonable prospect that the Debtors can obtain the funds

necessary to fully satisfy Wachovia's undersecured claims.  The Debtors appear equivocal.  It is

unclear whether they previously attempted or have any intention in the future to try to raise the

funds needed to pay off their entire indebtedness to Wachovia.  The complete lack of detail

regarding the Debtors' refinancing efforts leads me to conclude that their prospects of raising the

necessary  funds to satisfy Wachovia's claims and propose a confirmable reorganization plan are

too uncertain to justify permitting this case to proceed over Wachovia's opposition.[40]  In these

circumstances, Wachovia's request for dismissal of the cases under 11 U.S.C. §1112(b) should be

granted.

---

    [40]      To be clear and complete on the subject of refinancing as a means of reorganization in
these cases, I address one other slightly varied scenario: the relatively modest reduction of Wachovia's
allowed secured claims  through the §506(a) bifurcation process.  Here, too, I find that the Debtors have
not established that they have a reasonable prospect of obtaining the necessary financing to satisfy the
allowed secured claims.  Thus, even if the Debtors can legitimately create a potentially impaired
accepting class of creditors by establishing a convenience class, see n.33, supra & accompanying text,
they have not demonstrated a sufficient likelihood that funding is available to render such a plan feasible.

## V.  CONCLUSION

For the reasons set forth above, Wachovia's request for dismissal of these bankruptcy

cases will be granted and an order consistent with this Memorandum will be entered.

Date:   July 13, 2009

_____
**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**

-32-